Fabricant, J.
INTRODUCTION
These eighteen actions[1] challenge various regulatory decisions of the Department of Environmental Protection, the Secretary of Environmental Affairs, and the Quincy Conservation Commission with respect to the Quarry Hills Project and/or the Granite Rail Project. Presently before the Court, pursuant to a scheduling order dated September 13, 2002 (Patrick Brady, J.), are motions of the defendants for summary judgment on the ground that the actions are precluded by the plaintiffs’ covenant not to sue contained in a 1998 agreement to settle earlier litigation. For the reasons that will be explained, the motions will be allowed in part and denied in part.
BACKGROUND
The record before the Court on the present motions establishes the following factual and procedural background as undisputed.[2]
*516 1. The Plaintiff and the Project
The plaintiff, Daniel J. Quirk,[3] operates an automobile sales business, and related facilities, on Ricciuti Drive in Quincy, adjacent to what is known as the Quarry Hills Project. The project, situated partly in Quincy and partly in Milton, involves the transportation and depositing of large amounts of fill material excavated from the Central Artery Tunnel Project onto land formerly operated as a landfill, and then the construction of a golf course and other recreational facilities on that land. Quarry Hills Associates, Inc. (“QHA”), is the developer of the project. McCourt Construction Company, Inc. (“McCourt”), is its general contractor, and Sverdrup Civil, Inc., later known as Jacobs Civil, Inc. (“Sverdrup”), has served as lead design and engineering consultant. The project is subject to permits and approvals from various regulatory bodies at various levels of government. Quirk has alleged that the project harms his business in various ways, particularly by means of dust and dirt that becomes airborne through the transportation of fill and then becomes deposited on his inventory of cars, necessitating substantial expense to clean the cars for sale.
Various permits and approvals were issued for the project in or about 1997. Quirk challenged those by filing four lawsuits in this Court, nos. 97-1674, 2160, 2353, and 2473, as well as various administrative appeals. Among the defendants named in those suits were the Secretary of Environmental Affairs, the Department of Environmental Protection, the City of Quincy, Quarry Hills Associates, Inc., and McCourt. Beginning in or about November of 1997, the parties to those suits and their counsel, including the Office of the Attorney General on behalf of the various state agencies and officials involved, entered into settlement negotiations. Negotiations culminated in a settlement agreement, dated February 13, 1998, executed by Quirk, QHA, and the City of Quincy.[4] The settlement agreement, particularly paragraph 10(b) thereof, forms the basis for the present motions.
2. The Agreement
The settlement agreement begins with a series of eight recitations describing the parties, the project, and the circumstances. In the fourth recitation, the agreement acknowledges that the land in issue is owned “in part by Quincy, in part by the Metropolitan District Commission, (’MDC), and potentially, in part by the Town of Milton and in part by QHA.” The sixth recitation acknowledges that the project will involve transportation of fill that “is expected to take up to at least four years and require hundreds of daily inbound truck trips, which activities unless properly controlled may have an impact on Quirk’s business operations.” The seventh recitation acknowledges that “Quincy’s interest in the Quarry Hills Project and its participation in this Agreement derives from its status ... as owner of part of the Project Site, and as licensee of the MDC-owned portions of the Project Site.” Also acknowledged, in the eighth and final recitation, was that “Quirk, and in certain cases other named individuals (the ‘Additional Named Individuals’) have initiated a series of administrative and judicial challenges ... all of which actions either involve QHA and Quincy as parties, or are of immediate and direct interest to QHA and Quincy.”
After the recitations come fourteen numbered provisions, some with multiple sub-parts. The first nine of these set forth promises made to Quirk by the other parties, consisting of a series of measures to mitigate the impact of the project on Quirk’s business, along with provisions for enforcement, dispute resolution, and damages. Included are restrictions on the amount of material to be imported and the duration of importation, through the year 2005 (paragraphs 1 and 3(a)); commitments by QHA and Quincy to make certain improvements to Ricciuti Drive, including converting a part of it to a “four-lane, jersey barrier separated roadway” (paragraph 2); implementation by Quincy of certain traffic control measures, including strict enforcement of “all ordinances and regulations governing the speed and movement of vehicles on Ricciuti Drive, provision of a police detail during specified hours on Mondays,[5] and the limitation that ”no more than eight hundred (800) daily inbound truck loads of Central Artery/Tunnel excavate. .. will be allowed on the Haul Route portion of Ricciuti Drive[1]' (paragraph 3); implementation by QHA of “best management practices to prevent construction-generated dust emissions from migrating onto Quirk’s property,” meeting at a minimum the dust suppression requirements of the applicable permits, along with implementation by QHA and Quincy of “full time street-sweeping operations and, except during freezing weather conditions, full-time wheel-washing,” so that “(t]he surface of Ricciutti Dive shall be kept in good condition and clean at all times” (paragraph 4); commitment by “QHA and its contractors” and Quincy to “use best efforts to limit noise emission,” to “prevent an increase in the rate of storm water runoff,” and to plow Ricciuti Drive (paragraph 5); commitments by QHA and Quincy to make certain utility improvements, including moving a certain utility pole, within a specified time (paragraph 6); commitments by QHA and Quincy not to deposit materials contaminated above a specified level, along with acknowledgments of liability in the event of contamination affecting Quirk’s properly (paragraph 7); and a commitment by the City to grant Quirk certain parking rights, including the right to use a lot that the MDC had provided to Quincy, along with a commitment by Quincy to pave certain parts of that lot, and a commitment to grant Quirk an easement to post a sign at a nearby intersection (paragraph 8).
Paragraph 4, regarding dust suppression, contains its own provision for dispute resolution and damages. The parties agree to “designate a mutually acceptable insurance adjuster” who, upon request of Quirk, will *517 assess the need for “pre-sale preparation measures on account of dust generated in connection with” the project, and will assess damages for the cost of such measures, to be paid by QHA. The adjuster’s determination will be based on “guidelines mutually agreed upon,” which shall “take into consideration, at a minimum, the presence of dust generated from sources other than the Quarry Hills Project and the past practices of Quirk relative to washing vehicles.” The adjuster’s assessment of damages “shall be treated for all purposes as an arbitral award final and binding upon the parties.”
Paragraph 9 of the settlement agreement sets forth an overall dispute resolution mechanism. QHA and Quincy agree to designate a “proj ect monitor, ” to report to the Mayor of Quincy, “whose responsibilities shall include the response to and redress of any adverse environmental impacts that may occur.” If Quirk “is aggrieved by any aspect of the Quarry Hills Project construction,” it may submit the matter to the project monitor for “non-binding mediation.” In response to any such submission, within five days the project monitor “shall rule ... on what actions must be taken to remedy the alleged violation, and shall assess such damages as he deems appropriate.” Any party aggrieved by such a decision may proceed to non-binding mediation by the Mayor, and thereafter to binding arbitration by the American Arbitration Association.
Paragraph 10 of the agreement sets forth what are labeled “Mutual Covenants,” consisting of five. The first of these, paragraph 10(a), provides for execution and filing of stipulations of dismissal, without prejudice, of “all administrative and judicial actions . . . commenced in opposition to the Quarry Hills Project.”[6] The second and third “mutual covenants” set forth corresponding promises to forego specified future conduct. The first of these, paragraph 10(b), forms the basis for the present motions. It provides as follows:
Quirk covenants, alone and/or in conjunction with the Additional Named Individuals, or any other person or entity, not to appeal or otherwise oppose any permits or regulatory approvals issued or to be issued for the Quarry Hills Project, as such Project is defined herein.
In paragraph 10(c), QHA and Quincy covenant “not to appeal or otherwise oppose any permits or regulatory approvals issued or to be issued in connection with the establishment, modification, expansion or improvement of Quirk’s current automobile sales, storage and service business on Ricciuti Drive.”[7]
The remaining provisions of the agreement, paragraphs 1 ltrough 14, relate respectively to notice, authority, choice of law (Massachusetts), and integration. Paragraph 14 recites that the document “sets forth the entire agreement between the parties,” and “may not be terminated, amended, modified or waived except by a written agreement signed by all parties hereto.”
Upon execution of the agreement, QHA paid Quirk $300,000. Quirk acknowledged the payment by means of a written receipt, describing the payment as “relative to the Agreement reached this day by and among” the named parties. Quirk has not returned the payment, nor has it offered to do so. In his filings in connection with the present motions, Quirk admits that the payment was “part of the consideration for the agreement,” but characterizes it as a “minor” part.[8]
3. Quirk’s Claims of Breach
Quirk contends that beginning soon after the agreement was executed, QHA and Quincy committed numerous breaches of their obligations, particularly under paragraphs 2(a), 3(a), (d), and (e), 4(a), (b), and (c), and 8(c). He offers evidence as follows, which the Court considers in the light most favorable to Quirk.
According to Quirk’s affidavit, “(i]n the days, weeks and months” after execution of the agreement, Ricciutti Drive was not clean and in good condition at all times," but rather was “continuously dusty, dirty and muddy," QHA “did not implement full-time wheel washing of trucks except in freezing weather conditions,” and trucks left the project site and traveled on Ricciuti Drive “that appeared not to have had their wheels washed at all, or to have had them washed ineffectively." In further support of these assertions, Quirk offers a set of documents identified only as having been obtained either in discovery or through public records requests.[9]
Among the documents offered are a series of inspection reports on letterhead of Webster & Sampson Engineers, Inc.[10] A report dated April 14, 1998, indicates “[d]ust becoming a problem.” A report dated May 1998 reveals that “(s]ilt/mud runoff from the wheel wash has occurred down Ricciutti Drive” and “(d]ust problem developing from windy conditions atop Area C.” The record does not indicate the location of Area C in relation to Ricciuti drive or Quirk’s property. A June 18, 1998, report repeats “[d]ust problem developing from windy conditions atop Area C.” A July 21, 1998, report indicates that “(o]ne water truck was being used at the time of the inspection for dust control ... No street sweeping operations were observed at the time of the inspection. Some silt runoff was observed along Ricciuti Drive” and that “[p]roblems with dust continuing at east end of Ricciuti Drive.” A July 21, 1998, inspection report identifies deficiencies in the wheel washing operation, including a need for cleaning of “sediment controls” and “piping” that “appeared to be plugged and needs to be cleared.” An August 20, 1998, report notes “wheel wash is effective” but “no under carriage spray installed” and “settling pond and basis need cleaning.”
A June 29, 1998, letter from McCourt to the Quincy Commissioner of Public Works addresses the issue of dust, stating:
It has recently become evident that the trucks from the main line construction are arriving onsite in a *518 much dirtier state then (sic) the trucks from Subaru which are washed upon leaving the Subaru site. These unwashed trucks carrying wet loads tend to spill on Ricciutti Drive as they turn the comer and hit the first hill. This spillage, after drying, results in silt fines being left behind which create a dust situation. To date we have been sweeping and wetting down these areas, but I feel that we are now performing Mass Highway’s work in keeping the road clean from their operation ... I believe the dry spillage from the trucks could be addressed by washing the trucks before leaving Boston.
Similar findings appear in a report submitted to the Quincy DPW Commissioner by Ilyas Bhatti, P.E., regarding an inspection conducted on January 11, 2000.[11] Bhatti reports that the wheel-washing facility “was not working properly. Some tmcks were observed to pass through without the jets turning on, and the water pressure also seemed inadequate to do an effective job. Tmcks were seen leaving the wheel-wash with mud on the tires and the mud was being dropped/tracked all along Ricciuti Drive.”
A December 15, 1998, memorandum from David E. Standley, P. E.,[12] to the Quincy Commissioner, expresses opposition to “allowing an increase in the allowable truck trips.” Among the reasons stated is “[d]ifficuliy in maintaining acceptable conditions on Ricciuti Drive . .. under freezing conditions.” He elaborates: “It was clearly established last winter that keeping the roadways clean enough was essentially impossible under freezing conditions. Much of the time the wheel wash cannot be operated ... The street sweepers alone are not sufficiently effective ... increasing tmek trips during the winter months will significantly exacerbate the dust situation.”
With respect to the daily number of tmcks, Quirk offers the affidavit of Peter H. Guldberg and Erik Kalapinski of Tech Environmental, Inc., described as an “air quality consulting firm.” According to these affidavits, observations made by staff members of that firm between August 6 and 10, 1998, lead to an estimate of truck traffic at a rate of more than 1000 per day.
In early 1999, DEP was considering an application for a permit modification authorizing an increase in truck trips from 800 to 1200 per day. A memorandum from the DEP’s “special projects coordinator” to the director of its MEPA unit, dated March 22, 1999, expressed the view that the increase “can be adequately addressed” with specified mitigation measures. In a certificate dated April 1, 1999, the Commissioner determined that no environmental impact report was required for the increase, provided that certain conditions be imposed, including specifically that “the proponent should increase significantly the periodicily of street sweeping and roadway watering to control dust.”
DEP approved the increase in a permit modification letter, dated May 11, 1999, subject to specified conditions. The conditions included that QHA must implement “ ‘Clean Zone Procedures’ to minimize the effect of trucks tracking project-related soils beyond the wheel wash facility and easterly onto Ricciuti Drive,” and “Ricciuti Drive . . . shall be routinely swept and watered as frequently as necessary so that the lanes . . . are as clean as practicable and free of tracked or spilled material.” In addition, QHA must submit a plan for “an ambient air dust monitoring program” to include “periodic monitoring and quantification of the amount of PM 10 dust in the Willard Street and Ricciuti Drive intersection area.”
Three months later, on August 16, 1999, DEP issued a “Notice of Enforcement Conference,” informing QHA that inspections performed on May 27, 1999 and July 8, 1999, had identified certain violations of the conditions imposed in the May 11 approval. In particular, with respect to Ricciuti Drive, during the July 8, 1999, inspection DEP staff had observed trucks that “turned east on Ricciuti Drive and did not go over the wheel wash. Soil from these trucks was tracked on the existing clean zone lane.” DEP issued an administrative consent order in September of 1999, which it amended in November 2000. The amendment recites observations made by DEP staff on April 6, 2000, of trucks being inadequately washed, resulting in “(s)ediment . . . tracking onto Ricciuti Drive.” The amendment ordered certain remedial measures and penalties.
As noted supra, the agreement provided in paragraph 4(c) for compensation to Quirk for the effects of dust, through damages to be assessed by a “mutually acceptable independent insurance adjuster.” According to Quirk’s affidavit, however, “[b]y early August 1998, . . . there was no Independent Adjuster and no apparent prospect of reaching agreement on someone to serve in that capacity any time in the foreseeable future.” This circumstance arose, according to Quirk, although he “agreed to three different individuals to serve as the Independent Adjuster, two of whom QHA did not agree to, and one of whom was retained and then quit. . .”[13] In addition, negotiations over guidelines to be used by the adjuster broke down because “QHA and Quincy insisted that any guidelines they would agree to had to start from the premise that, even before the Quarry Hills Project began, I had incurred substantial costs in cleaning new cars to prepare them for sale.” That premise, Quirk asserts, “is untrue.”
Documents offered in support of these assertions reflect the parties’joint appointment of James Dolliver as independent adjuster on May 7, 1998; proposals for appointment of another person as adjuster, beginning on July 1, 1998; and circulation of a series of draft guidelines between May and September of 1998. The Court has reviewed the various drafts, and concludes that neither side’s position, as expressed in *519 these documents, departs so significantly from the language of the agreement as to constitute evidence of a refusal to negotiate in good faith. Nor does any of the documents offered indicate the reason for Mr. Dolliver’s departure.[14]
Quirk further asserts that in the “days, weeks and months” after the agreement, Quincy “did not strictly enforce all ordinances and regulations governing the speed and movement of vehicles on Ricciuti Drive. To the contrary, I personally observed that there was no regular police presence . . . and literally no effort was made to enforce speed limits or other traffic regulations.” Quirk also reports personally observing speeding trucks and “near accidents,” and that “on two occasions, trucks hit a certain telephone pole on Ricciuti Drive, resulting in a loss of electrical power at my Ricciuti Drive facility and the disruption of two auto auctions, one of which had to be cancelled.”[15] In support of these assertions, Quirk offers a letter from him, dated April 13, 1999, to Quincy’s project manager, complaining of these and other traffic-related problems.
On a night in the summer of 1999, according to Quirk’s affidavit, “QHA or its agents moved the jersey barriers that had been placed in the center of Ricciuti Drive,” resulting in “the elimination of one of the two lanes that had existed for the exclusive use of Quirk and other businesses on Ricciuti Drive, and the creation of an additional lane for Project-related truck traffic.” Quirk does not indicate the length of the barriers that were moved, or their location in relation to his business. Documents offered in support of Quirk’s assertion on this subject consist of correspondence from various representatives of QHA or its contractors to Quincy officials seeking permission to move the barriers for various lengths, at a location described as such as to permit “an additional lane for trucks to queue before the scales.” A letter from McCourt states that the new location “would not negatively impact the local businesses along the south side of Ricciuti Drive as their entrance is over 1000 LF to the east.”
Quirk also asserts that Quincy did not grant him the easement promised in paragraph 8(c) of the agreement, for a sign at the intersection of Ricciuti Drive, citing the Cily Council’s unwillingness to grant approval.
Quirk estimates that his damages resulting from these breaches “total in excess of $6,000,000.” He does not explain how he arrives at that estimate, nor does he offer any financial records, expert financial analysis, or the like.
Quirk does not offer evidence of breach of any other portions of the agreement. In particular, he offers no evidence that QHA and Quincy have not complied with their obligations relating to limitations on the total amount of material to be imported and the timing of its importation (paragraph 1); improvements to Ricciuti Drive other than the movement of the jersey barrier referred to supra (paragraph 2); aspects of traffic control other than those referred to supra (paragraph 3(b) and (c)); noise, drainage, and snow removal (paragraph 5); utility improvements (paragraph 6); environmental protection, including the absence of contaminated material (paragraph 7); and parking, including providing Quirk the use of the MDC lot and paving a portion of that lot (paragraphs 8(a), (b), and (d)). With respect to paragraph 6(e), regarding parking, Sverdrup offers evidence that in 1998 it “provided services” to Quirk “in obtaining all permits and other approvals attendant to the construction of an auto storage lot” on Quirk’s properly. Quirk offers no contrary evidence.[16] With respect to the dispute resolution mechanism provided in paragraph 9, nothing in the evidence offered indicates whether Quirk has ever invoked it, beyond sending the one letter of complaint regarding traffic conditions referred to supra, nor does the evidence indicate what, if any, response he has received. Nor does Quirk offer anything to indicate that QHA and/or Quincy have in any way violated their covenant, at paragraph 10(c), not to oppose any efforts by Quirk to obtain approvals for improvement of his property.
4. Litigation Since the Agreement
On June 3, 1998, less than four months after execution of the agreement, Quirk brought Civil Action No. 98-0995 against McCourt Construction Co., Inc. The complaint in that case alleges trespass, nuisance, and negligence based on dust emissions on Ricciuti Drive, and seeks damages. The case remains pending, and has been consolidated with No. 99-0445, to be discussed infra.
Two months later, and less than six months after execution of the agreement, on August 2, 1998, Quirk brought Civil Action No. 98-1418, naming QHA, McCourt and Quincy. This action, brought under G.L.c. 214, §7A, and other state and federal environmental statutes, alleged that “the Project is proceeding in violation of the conditions of numerous environmental permits and approvals, and in violation of the statutes and regulations under which those permits and approvals were issued,” thereby causing environmental harm. After the Court declined to consider Quirk’s request for a preliminary injunction, “in view of the on-going regulation of the project at the local and state administrative levels,” the parties stipulated to dismissal without prejudice.
Some three months later, on November 30, 1998, Quirk brought Civil Action No. 98-02107, naming QHA and the Massachusetts Department of Environmental Protection (“DEP’j, challenging DEP’s issuance of a solid waste facilities plan approval and permit modification. The complaint seeks review pursuant to G.L.c. 30A and declaratory judgment. Both named defendants have moved for summary judgment. This *520 case is the earliest of the eighteen cases that are the subject of the present motions.
In March of 1999, Quirk filed Civil Action No. 99-0445, naming QHA, McCourt Construction Company, Inc., and Quincy. The Amended Complaint, dated March 26, 2001, sets forth twenty-two counts. Among these are four that rely on the agreement, which the complaint alleges “is a valid and binding contract” as between Quirk and QHA and Quincy. Counts XI and XII allege breach of contract against QHA, for which Quirk seek damages and specific performance;[17] counts XIV and XV assert the same claims against Quincy. The factual basis alleged for these as well as the other counts of the complaint includes the following. The project generates “massive amounts of dust, dirt and mud that migrates . . . onto the Quirk Property . . . and coats the vehicles stored outdoors at the Quirk Property ... As a result . . . Quirk must clean and recondition thousands of vehicles ... at substantial expense.” Since the agreement, QHA and McCourt “have failed to implement best management practices to prevent dust . . . from migrating onto the Quirk Property,” QHA and Quincy “have failed to keep the surface of Ricciuti Drive in good condition and clean at all times, failed to move the designated utility pole[18] . . . and failed to observe the daily limit of 800 inbound truck loads of fill material,” and Quincy “has failed to provide a police detail on Mondays as agreed.” Further, QHA “has failed to designate an independent insurance Adjuster or to negotiate in good faith to reach mutually acceptable guidelines to be followed by the Adjuster.” This case has been consolidated with No. 98-0995, and the two will be referred to herein for convenience as “the damages actions." The present motions do not encompass these cases.[19] Counsel report that these cases will be ready for trial within the next several months.
On June 14, 1999, Quirk brought Civil Action No. 99-00974, naming DEP and QHA, challenging a solid waste permit modification for the project. The complaint as amended seeks review pursuant to G.L.c. 30A, declaratory judgment, and injunctive relief pursuant to G. L.c. 214, §7A. Both defendants have moved for summaryjudgment. This is the second of the cases that are the subject of these motions.
Quirk filed the next case, Civil Action No. 99-01380, on August 23, 1999. This action, naming DEP and QHA, presents an appeal under G.L.c. 30A from DEP’s administrative dismissal of Quirk’s adjudicatory appeal from the issuance of the same solid waste plan approval and permit modification challenged in No. 98-02107. Count I, relating to the plan approval, was ordered dismissed on September 29, 2000, upon the Court’s (Donovan, J.) decision denying Quirk’s motion for judgment on the pleadings as to that count, and ordering judgment on the pleadings for the defendants. That motion did not encompass count II, relating to the permit modification, and that count remains pending. Both named defendants have moved for summary judgment. This is the third of the cases that are the subject of the present motions.
On January 14, 2000, Quirk brought Civil Action No. 00-00061, naming DEP and QHA, and challenging, pursuant to G.L.c. 30A, DEP’s dismissal of an adjudicatory appeal from the issuance of the same permit modification that is the subject of No. 99-0974. Both named defendants have moved for summary judgment. This is the fourth of the cases that are the subject of the present motions.
On March 19, 2000, Quirk brought Civil Action No. 00-00381, naming DEP and QHA. This case challenges two administrative consent orders issued by DEP to QHA; Quirk seeks review pursuant to G.L.c. 30A, certiorari, and/or mandamus, and declaratory judgment. The complaint also asserts a claim that DEP violated the open meeting law in its proceedings leading to issuance of the challenged order, and a claim seeking to have the Court impose civil penalties for the permit violations underlying the order, beyond those imposed by DEP in the order. Both named defendants have moved for summaryjudgment. This is the fifth of the cases that are the subject of the present motions.
On June 5, 2000, Quirk brought Civil Action No. 00-00885, naming DEP and QHA. This case seeks review pursuant to G.L.c. 30A of a solid waste permit modification, and declaratory judgment. The complaint also asserts a claim that DEP violated the public records law by failing to produce certain records requested in connection with Quirk’s opposition to the permit modification. Both named defendants have moved for summaryjudgment. This is the sixth of the cases that are the subject of the present motions.
On October 30, 2000, Quirk filed Civil Action No. 00-1517, naming MDC, QHA, and the members of the Quincy Conservation Commission. The complaint, as amended, challenges an order of conditions issued by the Quincy Conservation Commission for the filling of the Granite Rail Quarry with material from the Central Artery Tunnel Project. The Commonwealth and Quincy have moved for summary judgment in this case, although the parties agree that the site known as the Granite Rail Quarry is not part of the Quarry Hills Project as defined in the agreement. QHA has not moved for summaryjudgment in this case. This is the seventh case that is the subject of these motions.[20]
On November 17, 2000, Quirk filed Civil Action No. 00-1773, naming QHA; its design and engineering consultant, J.E. Sverdrup Civil, Inc.; its general contractor, McCourt; DEP; the MDC; the Executive Office of Environmental Affairs; and the members of the Quincy Conservation Commission. This complaint, as amended, challenges certain approvals issued by the DEP with respect to the use of certain landfill cover materials at the Quarry Hills Project, and also challenges a second order of conditions and a certificate of emergency status issued by the Quincy Conservation *521 Commission for the Granite Rail Quarry, as well as a decision of the DEP concurring with the emergency status determination, and an administrative consent order issued by DEP with respect to the Granite Rail Quarry. As to the various approvals, the complaint seeks review pursuant G.L.c. 30A and/or certiorari. As to work performed allegedly pursuant to the challenged approvals or in violation of previously issued approvals, the complaint seeks to have the Court impose civil penalties against QHA and its contractors and the MDC, pursuant to various environmental statutes. The complaint also asserts civil conspiracy among all the defendants, for which it seeks damages. The Commonwealth defendants and Quincy have moved for summary judgment in this case; the other defendants have not.[21] This is the eighth case that is the subject of these motions.
On December 29, 2000, Quirk filed Civil Action No. 00-01997, naming DEP, MDC, QHA, Quincy, and the members of the Quincy Conservation Commission. This case challenges a determination by the DEP that the Granite Rail Quarry project did not require a water quality certification under state and federal statutes, and a determination by the Secretary of Environmental Affairs that the project did not require an environmental impact statement. The complaint seeks certiorari review of the water quality certification decision, declaratory judgment, and injunctive relief against the project under G.L.c. 214, §7A. The Commonwealth and Quincy have moved for summary judgment in this case, although, as noted supra, the parties agree that the Granite Rail Quarry project is not within the agreement. QHA has not moved for summary judgment in this case. This is the ninth case that is the subject of these motions.[22]
On January 14, 2001, Quirk filed Civil Action No. 01-00008, naming DEP and QHA, challenging an amendment to an administrative consent order for the Quarry Hills Project. The complaint sought review under G.L.c. 30A, certiorari, and/or mandamus, and declaratory judgment. Also included was a claim that DEP had violated the open meeting law, and a count seeking to have the Court impose civil penalties for the violations addressed in the administrative consent order. Quirk never filed returns of service in this action, and reported it resolved when called for status review. The Court dismissed the case on September 13, 2001.
On May 23, 2001, Quirk brought Civil Action No. 01-00808, naming QHA and three related entities: The Finger Companies, Inc., developer of a residential project planned for the site of the Quarry Hills Project; Sverdrup; McCourt; MDC; DEP; Quincy; and the Town of Milton. The complaint, as amended, alleges that DEP erroneously determined that certain aspects of the project, including the residential development and a hotel development, did not require separate environmental impact reports, and also that DEP erroneously issued various administrative consent orders and other enforcement decisions. The complaint seeks declaratory judgment, injunctive relief pursuant to G.L.c. 214, §7A, and damages for alleged civil conspiracy among all defendants. The Commonwealth defendants, QHA, McCourt, Sverdrup, Quincy and Milton have moved for summary judgment; The Finger Companies, Inc., has not. This is the tenth case that is the subject of the present motions.
On June 29, 2001, Quirk brought Civil Action No. 01-01037, naming QHA, DEP and the Town of Milton. This case challenges, pursuant to G.L.c. 30A, an administrative consent order issued by DEP to Milton; the complaint also asserts a claim that DEP violated the open meeting law, and a claim seeking to have the Court impose civil penalties on Milton for the violations underlying the administrative consent order. All named defendants have moved for summary judgment. This is the eleventh case that is the subject of the present motions.
On August 23, 2001, Quirk brought Civil Action No. 01-01340, naming DEP, MDC, QHA, McCourt, Sverdrup, and another contractor, New England Waste Services of ME, Inc.;[23] and the Towns of Milton and Erving. This case challenges DEP’s approval of a material described as “short paper fiber,” from a Town of Erving facility, as final cover for the Quarry Hills Project. The complaint as amended seeks review pursuant to G.L.c. 30A, injunctive relief pursuant to G.L.c. 214, §7A, and declaratory judgment. All defendants except Erving have moved for summary judgment. This is the twelfth case that is the subject of these motions.
On October 15, 2001, Quirk brought Civil Action No. 01-01624, naming DEP, QHA, Sverdrup, and Milton. This action seeks review pursuant to G.L.c. 30A, and declaratory judgment, with respect to DEP’s issuance of a “major modification” of prior permits relating to the use of certain final cover material at the Quarry Hills Project. The complaint, as amended, also seeks to have the Court impose civil penalties on QHA, Sverdrup, and Milton, for activities under the DEP approved modification, alleged to be in violation of various environmental statutes. All named defendants have moved for summary judgment. This is the thirteenth of the cases that are the subject of these motions.
A month later, on November 14, 2001, Quirk brought Civil Action No. 01-01804, naming DEP, QHA, McCourt, and Sverdrup. The case challenges DEP’s issuance of an administrative consent order to QHA for the Quarry Hills Project. The complaint seeks review pursuant to G.L.c. 30A and/or certiorari, and declaratory judgment. The complaint also alleges violation of the open meeting law in the DEP proceedings leading to issuance of the order, and seeks to have the Court impose civil penalties for the various alleged violations of environmental statutes underlying the *522 order. All named defendants have moved for summary judgment.[24] This is the fourteenth of the cases that are the subject of these motions.
On December 14, 2001, Quirk filed Civil Action No. 01-01987, naming The Finger Companies, Inc. and a related corporation; QHA and a related corporation; and the members of the Quincy Conservation Commission. This action challenges an order of conditions issued by the Quincy Conservation Commission for a proposed residential development at the Quarry Hills Project; the complaint as amended seeks certiorari review, mandamus, and declaratory judgment. Quincy has moved for summary judgment; the other defendants have not. This is the fifteenth of the cases that are the subject of these motions.
On December 17, 2001, Quirk filed Civil Action No. 01-01994, naming QHA, DEP, and MDC, challenging a “closure and post closure plan approval” issued by DEP for the Granite Rail Quarry Project. The complaint seeks judicial review under G.L.c. 30A, certiorari and/or mandamus, and declaratory judgment. Also included is a claim seeking to have the court impose civil penalties for activities under the approval, as well as a claim for injunctive relief. The Commonwealth has moved for summary judgment in this case; QHA has not, explaining that Granite Rail Quarry is not part of the project covered by the agreement. This is the sixteenth of the cases that are the subject of these motions.
On the same date, December 17, 2001, Quirk also filed Civil Action No. 01-01998, naming QHA, McCourt, MDC, Quincy, and the members of the Quincy Conservation Commission. This case challenges the Quincy Conservation Commission’s acceptance of an amended plan for the location of a golf clubhouse at the Quarry Hills Project. The complaint seeks certiorari review, mandamus, declaratory judgment, and injunctive relief pursuant to various environmental statutes. The Court (Burnes, J.) denied a motion for preliminary injunction on December 31, 2001, finding no likelihood of success on the merits. All named defendants have moved for summary judgment. This is the seventeenth of the cases that are the subject of this motion.
Finally, on April 26, 2002, Quirk brought Civil Action no. 02-00694, naming QHA and three related entities, Sverdrup, McCourt, New England Waste Services of ME, Inc., Bechtel/Parsons Brinckerhoff, DEP, MDC, the Massachusetts Highway Department, the Massachusetts Turnpike Authority, Quincy, and Milton. The action challenges DEP’s approval of a solid waste permit modification for the Quarry Hills Project. The complaint as amended seeks review pursuant to G.L.c. 30A certiorari, and/or mandamus, and declaratory judgment. The complaint also seeks to have the Court impose civil penalties for alleged violations of the permit authorized by the approval, and also includes a claim for damages for alleged civil conspiracy. All named defendants except The Massachusetts Turnpike Authority and Bechtel/Parsons Brinckerhoff have moved for summary judgment. This is the eighteenth of the cases that are the subject of this motion.
DISCUSSION
1. Summary Judgment Standard
This Court grants summary judgment where there are no genuine issues of material fact and where the record entitles the moving party to judgment as a matter of law. See Mass.R.Civ.P. 56 (c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of establishing that there is no issue of material fact on every relevant issue. See Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a genuine dispute of material fact for trial either by submitting affirmative evidence negating an essential element of the non-moving party’s case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. See Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Once the moving party establishes the absence of a triable issue by either of these methods, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. See Pederson v. Time, 404 Mass. 14, 17 (1989). The opposing party may not rest on the allegations of the pleadings, nor rely on “bare assertions and conclusions regarding [his own] understandings, beliefs, and assumptions.” Key Capital Corp. v. M & S Liquidating Corp., 27 Mass.App.Ct. 721, 728 (1989). Mere contradictions of factual allegations, without evidentiary support, are insufficient to raise questions of material fact sufficient to defeat a summary judgment motion. See Madsen v. Erwin, 395 Mass. 715, 721 (1985), quoting Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3rd Cir. 1972) (noting that conclusoiy statements, denials, and allegations are insufficient to raise material issues of fact). The opposing party’s obligation, rather, is to demonstrate the existence of admissible evidence sufficient to meet the burden of proof on the issues raised by the motion.
In deciding motions for summary judgment, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. The Court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility or find facts. See Mass.R.Civ.P. 56(c); Dawes, 369 Mass. at 553; Colley v. Benson, Young & Downs Ins. Agency, Inc., 42 Mass.App.Ct. 527, 528; see also Kelley v. Rossi, 395 Mass. 659, 663 (1985).
*523 2. Enforceability of the Covenant
In each of the eighteen cases that are the subject of these motions, the moving defendants argue that paragraph 10(b) of the agreement, in which Quirk promised “not to appeal or otherwise oppose any permits or regulatory approvals issued or to be issued for the Quarry Hills Project,” bars his claims. Quirk’s principal response is that he is not bound by his promise because QHA’s and Quincy’s breaches of their obligations under the agreement are so material as to excuse Quirk from performance. Those defendants’ breaches, he contends, have relieved him of any obligation of performance under the contract, as well as giving him a cause of action for breach of contract, entitling him to damages, specific performance, and other remedies. Quirk sees no anomaly in this position; he unabashedly asserts a right to receive the full benefits of the contract, through its enforcement in his damages actions, while suffering none of the detriment to which he agreed, beyond the dismissal without prejudice of the four original cases. Moreover, he says, the question of materiality of the alleged breaches is necessarily one of fact, incapable of resolution on summary judgment. Thus, he concludes, he is entitled to have each of these cases remain pending at least until such time as the damages action is resolved. Quirk’s position finds superficial support in the case law, but does not bear deeper examination. Ultimately, this Court concludes, the law does not permit Quirk to have his cake and eat it too in the manner he proposes.
The general rule, as Quirk recites, is that “a material breach by one party excuses the other party from further performance under the contract.” Lease-It, Inc. v. Massachusetts Port Authority, 33 Mass.App.Ct. 391, 397 (1992), quoting Ward v. American Mutual Liability Ins. Co., 15 Mass.App.Ct. 98, 100 (1983). In some factual contexts, as Quirk suggests, application of the rule results in the wronged party not only being freed of its contractual obligations, as well as of any liability for damages for their breach, but also retaining a cause of action for damages for the other party’s breach. See Gibson v. Cranston, 37 F.3d 731, 736 (1st Cir. 1994). Usually, however, the consequence of a material breach is described as rescission, or termination, of the contract; the wronged party has the option of declaring the contract ended, and refusing to fulfill any remaining obligation thereunder, but does not also have a right to compel the breaching party to fulfill its remaining contractual obligations or pay damages for failing to do so. See, e.g., Bucholz v. Green Bros. Co., 272 Mass. 49, 52 (1930) (failure by purchaser of services to pay for services already performed was “so serious and so intimately connected with the substance of the contracts as to justify the plaintiff in refusing to go on with them or to be bound further by them”; plaintiff could recover arrearage due, despite failure to continue performance, but no suggestion that plaintiff could compel defendant to continue making payments despite non-delivery of further goods).
In some circumstances, the wronged party, although freed of the liability that might otherwise arise from its own failure to perform, nevertheless must provide at least a proportionate share of performance in return for its remedy for the other side’s non-performance. See, e.g., Boston Housing Authority v. Hemingway, 363 Mass. 184, 201 (1973) (landlord’s material breach of implied warranty of habitability excuses tenant’s withholding of rent, so that tenant is not subject to eviction for non-payment, but tenant remains “liable for the reasonable value, if any, of his use of the premises for the time he was in possession”); Lander v. Samuel Heller Leather Co., 314 Mass. 592, 597 (1943) (buyer of defective goods entitled to withhold payment so as to secure damages, but not freed of all payment obligation).
Review of the cases thus teaches that application of the rule is not as mechanical as Quirk seems to suggest. Material breach does indeed excuse further performance as a general rule, but whether that excuse is so absolute that the wronged party may fully enforce performance by the other, while nevertheless refusing any performance of its own, depends on whether such a result is just in the particular circumstances of the case. See Gibson v. Cranston, 37 F.3d at 736, n. 5 (“The rigid material/non-material dichotomy may oversimplify the universe of breaches . . . there may be an intermediate level of breach, i.e. breaches which are not serious enough to warrant repudiation of the contract and a suit for damages by the injured party, but which nonetheless might constitute a defense to an action for damages brought by the parly committing the initial breach”).
Similarly, although materiality is usually a question of fact, that rule is also not absolute. On a motion for summary judgment, the Court must consider the evidence offered as to materiality in the light most favorable the non-moving party. If the evidence as so considered would not warrant a finding of materiality, materiality is absent as a matter of law, and the Court must so rule. See Lease-It, Inc. v. Massachusetts Port Authority, 33 Mass.App.Ct. at 396 (although materiality “normally is a question for the jury to decide, . . . (o]n this record, however, we may decide the matter on our own”); Gibson v. Cranston, 37 F.3d at 735-36 (non-materiality properly decided on directed verdict); Dunkin Donuts Incorporated v. Gav-Stra Donuts, Inc., 139 F.Sup.2d 147, 155 (D.Mass. 2001) (deciding non-materiality on summary judgment).
What constitutes materiality for this purpose is, of course, the crucial question. The case law supplies descriptive language, but no bright-line rule. See, e.g., Lease-It, Inc. v. Massachusetts Port Authority, 33 Mass.App.Ct. at 396 (“material breach occurs when there is a breach of‘an essential and inducing feature of the contract’ ”; party’s refusal to perform its “sole obligation ‘was a substantial breach going to the root of the contract’ ”), quoting Bucholz. v. Green Bros., 272 *524 Mass. at 52, and Aerostatic Engr. Corp. v. Szczawinski, 1 Mass.App.Ct. 141, 145 (1973); Gibson v. Cranston, 37 F.3d at 735 (“Some courts and commentators have cast the standard in terms of a ‘total’ breach as opposed to a ‘partial’ breach”).
Ultimately, it appears, the only rule to be divined from the cases is an essentially circular one: a breach is deemed material if, under all the circumstances, it is consistent with justice that the party suffering the breach be excused from all obligation of performance. See, e.g., Center Garment Co. v. United Refrigerator Co., 369 Mass. 633, 638 (1976) (defining question as “whether the defendant’s breach entitled the plaintiff merely to recover for that breach while continuing to abide by the contract, or was so material in all the circumstances as to justify the plaintiff in throwing the contract over and suing for total breach”); Cetrone v. Paul Livoli, Inc. 337 Mass. 607, 610 (1958) (“the judge could have concluded that there had been a breach of the contract ... of such a nature as to preclude recovery under it by the corporation and excuse Cetrone from further performance”). If that result is not warranted in the circumstances, the breach is not material, although it may nevertheless give rise to a cause of action for damages or other relief. See Lease-It, Inc. v. Massachusetts Port Authority, 33 Mass.App.Ct. at 396. Materiality is always a matter to “be determined in the circumstances of each case.” Boston Housing Authority v. Hemingway, 363 Mass. at 200. “The determination of materiality, like other aspects of contract interpretation, must be based largely on a standard of objective reasonableness rather than purely subjective belief.” Gibson v. Cranston, 37 F.3d at 737.[25] The Restatement supplies five factors to assist in making the distinction, as follows;
(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.
Restatement (Second) of Contracts §241 (1981); see Ward v. American Mutual Liability Ins. Co., 15 Mass.App.Ct. at 101 (citing Restatement). Application of these factors to the evidence offered by Quirk reveals that, to the extent they can be evaluated based on this record, at least four out of five, (a), (b), (c), and (e), weigh against a determination of materiality.
The evidence offered indicates that Quirk has received substantial parts, although not all, of the benefit he was promised for the agreement, and that he still stands to receive some benefits scheduled to occur at dates that have not yet arrived. He received interim road improvements, with promised permanent road improvements awaiting completion of the project, and no indication they will not occur. He received some, although not all, of the traffic control measures promised. He received the benefit of the agreed noise, drainage, and snow removal measures, utility improvements, and environmental protection provisions. He received, and apparently still enjoys, the benefit of the parking provisions, including the use of the MDC lot, along with paving at others’ expense. He received the opportunity to seek redress of any violation, including by monetary damages, through the dispute resolution process provided in paragraph 9, although it does not appear that he has taken that opportunity. He received freedom to seek his own permits without risk of opposition from the parties to the agreement. And finally, he received and kept $300,000. These benefits, taken together, are certainly significant, although they fall short of everything he was promised.
The promised benefits of which Quirk has been deprived are also substantial, when the evidence offered is viewed in the light most favorable to him. For the period of time the transportation of Central Artery Tunnel excavate proceeded, he was subjected to the passage of more than the agreed daily number of trucks, with less than the agreed level of effective dust control.[26] How much less, and with what degree of impact oh Quirk’s business, is impossible to gauge from the evidence offered, but the inadequacy of performance in this area appears at least significant enough to have drawn the attention of inspectors on a number of occasions. Quirk also did not receive the benefit of the agreed mechanism for compensating him for such inadequacy, although this failure appears attributable more to a mutual breakdown in negotiation than to any breach on the part of the other parties.[27] In addition, he did not receive the full benefit of the traffic control measures promised. As a result, he experienced power failures caused by truck collisions on two occasions, presumably with resulting loss of business.[28] Finally, he did not receive the promised sign easement, with its potential benefit to his business. These losses are hardly inconsequential, but in the context of the agreement overall, they do not appear to dwarf the benefits received.
The second factor is the extent to which Quirk can be adequately compensated. He himself has offered a figure of six million dollars as his damages, albeit without offering any support for that figure. Whether that amount may ultimately be proved or not, his assertion of it implicitly acknowledges the adequacy of monetary damages for the breaches claimed, and indeed their nature suggests that damages would be measurable and adequate. The effect of dust is to *525 impose costs to clean cars; the number of cars affected, and the cost to clean them, should be matters fully capable of determination by reference to Quirk’s own records. Similarly, to the extent that traffic difficulties, and any power failures caused by resulting collisions, may have affected Quirk’s business, his own business records should provide a basis for quantification. As to the sign, the economic value of such a sign would seem capable of expert evaluation.
The third factor, the extent to which the other parties would suffer forfeiture, weighs clearly and strongly in favor of the defendants here. The only benefit to QHA and Quincy provided in the entire agreement, other than dismissal of the then pending cases, was the covenant provided in paragraph 10(b). The purpose of the agreement for them is plainly apparent from its terms: they were buying peace from litigation, whether judicial or administrative, in return for their multiple undertakings, along with the payment of $300,000. If, as Quirk urges, he is excused from performance while still able to enforce all their obligations under the agreement, they will suffer a virtually complete forfeiture of eveiything they have given and will yet be compelled to give, receiving nothing in return.
The fourth factor is the prospect of cure. Obviously, past breaches relating to dust and traffic control cannot be cured, although as discussed supra, monetary damages would seem fully capable of compensating for past harms. Whatever dust and traffic concerns arise from on-going construction activity might well be subject to more effective control, given diligent effort. The matter of the sign would seem to be capable of cure. The record, however, provides no basis for evaluating the likelihood of cure in any of these areas.
The final factor is the extent to which the non-performing party — that is, for this analysis, QHA and Quincy — have exhibited good faith and fair dealing. The only evidence offered to suggest that they have not is Quirk’s characterization of the failed negotiations surrounding guidelines to be used by the independent insurance adjuster. As discussed supra, the documents offered in support of that characterization do not support it.
Based on these factors, the Court concludes that the breaches shown by the evidence offered, considered in the light most favorable to Quirk, are not sufficient to support a finding of materiality. Accordingly, the covenant set forth at paragraph 10(b) remains fully enforceable, despite the claimed breaches, and regardless of what may happen to those claims at the trial of the damages cases. It follows that, at the veiy least, QHA and Quincy are entitled to judgment as a matter of law as to all claims in all cases that fall within the covenant.
The parties have devoted substantial attention to the question of whether the other defendants, who are not parties to the agreement, are entitled to judgment on this ground. They have analyzed this issue as a question of whether these parties are third-party beneficiaries of the covenant, each defendant arguing that it is, and Quirk contending that it is not. In the Court’s view, this analysis is unnecessary. Quirk promised QHA and Quincy that he would not “appeal or otherwise oppose any permits or regulatory approvals issued or to be issued for the Quarry Hills Project.” They, and each of them, are entitled to enforce that promise, and to obtain its full benefit. The promise was not just that Quirk would not sue these parties, but would remain free to challenge the same approvals by suing others. Such a promise would be virtually hollow, since any challenge to the approvals these parties need to proceed with the work necessarily affects them, regardless of who might be named as a defendant. The promise is fully enforceable as written. Accordingly, QHA and Quincy are entitled, on motion of either or both of them, to dismissal in its entirety, as to every named defendant, of every claim in every case that challenges any permit or approval for the project.
2. Scope of the Covenant
It remains to determine, as to each claim in each of the cases that is the subject of any of the present motions, whether such claim constitutes an appeal from, or opposition to, a permit or regulatory approval for the Quarry Hills Project. This task raises questions both as to the nature of the claims raised and as to the scope of the project as defined in the agreement.
With respect to claims, clearly any claim seeking review under G.L.c. 30A, certiorari, or mandamus, with respect to a permit, modification or amendment of a permit, order of conditions, or other regulatory determination is barred by the covenant, and Quirk does not appear to suggest otherwise. Similarly, any claim seeking declaratory or injunctive relief that depends on the invalidity of permits or approvals is barred. This ruling resolves six cases in their entirety, Civil Actions Nos. 98-02107, 99-0974, 99-01380, 99-00061, 01-01340 and 01-01998. This ruling also resolves these types of claims in three others, Nos. 00-00885, 01-01624, and 02-00694.
Quirk does suggest that administrative consent orders might fall into a different category, since they involve enforcement of permit conditions, rather than the issuance of permits. Having examined the administrative consent orders that appear in the record and as attachments to some of the complaints listed supra, the Court disagrees. Such orders, in substance, permit the project to proceed, despite allegations of violations, subject to specified conditions, sometimes including payment of penalties. In this respect, they function as regulatory approvals, as essential to the project’s continuation as the underlying permits, particularly in connection with a project of this magnitude and complexity. Challenges to these orders could prevent the project’s completion, as effectively as chai *526 lenges to any permit or other approval. A reading of the covenant that would leave Quirk free to bring such challenges would gut the covenant of any effective force.
Quirk makes reference to paragraphs 10(d) and (e) of the agreement. Paragraph 10(d) provides that nothing in 10(b) and (c) “shall be construed ... as a waiver ... of any obligations of any party to comply with applicable local rules and ordinances, and with state and federal rules and regulations and statutes.” The suggestion seems to be that this language preserves Quirk’s right to take any action it chooses to seek enforcement of any law. That reading would eliminate the covenant entirely, since he could then oppose or appeal permits on the ground that their issuance would allow violation of law. Read in context, and in harmony with the other provisions, paragraph 10(d) appears to mean exactly what it says: that the agreement does not in itself free any party from obligations to comply with applicable law. The provision says nothing about who may or may not challenge the outcome of regulatory action.[29] That subject, to the extent the agreement addresses it, is covered by paragraphs 10(b) and 10(c). Paragraph 10(e) reserves all parties’ rights “relative to claims on matters not covered by the terms of this Agreement”; this language contributes nothing to interpretation of what is or is not covered by 10(b). The Court therefore concludes that regulatory consent orders are “regulatory approvals” for purposes of paragraph 10(b) of the agreement, so that any claims in any of the cases challenging such orders are subject to dismissal, as to all named defendants, on motion of QHA and/or Quincy.
Several of the cases that challenge administrative consent orders also include claims seeking to have the Court impose civil penalties for the conduct that is addressed in the orders. Such claims may not technically constitute “appeals” from the orders, but they certainly do constitute opposition to them; indeed the essence of these claims is that the administrative consent orders were wrongly issued, in that they did not adequately enforce statutory or regulatory requirements that are within the issuing agency’s enforcement powers. The outcome of such claims, if successful, would effectively halt the project, just as would successful appeals from permits. These claims are barred. These rulings resolve these types of claims in Civil Actions Nos. 00-00381, 01-01037, 01-01804, and 02-00694, and what remains of No. 01-01624.
Another type of claim that appears in several of the actions is a claim that seeks to invalidate regulatory action based on alleged procedural defects, such as alleged violation of the open meeting law. These claims, if successful, would accomplish exactly the same result as would direct appeals from the regulatory decisions. They are barred by the covenant. This ruling resolves what remains of Civil Actions Nos. 00-00381, 01-1037, and 01-01804.
One case, Civil Action No. 00885, asserts a claim of violation of the public record law by the regulatory agency. Quirk is certainly free to make public record requests, like any other member of the public, and to challenge any unsatisfactory response by either the administrative or the litigation route provided by the statute. See G.L.c. 66, § 10(b). In the context of the case in which this claim appears, however, it is apparent that both the claim and the underlying public records are merely means of opposition to the challenged regulatory action, and thus fall within the prohibition of the covenant. This ruling resolves what remains of this case.
Finally, several of the cases assert claims of civil conspiracy. The conduct alleged to constitute the conspiracy, is, in substance, the issuance of the challenged regulatory approvals, by means of the various alleged procedural irregularities, and pursuant to allegedly improper agreements, along with activity under those approvals. Thus these claims are, at their heart, roundabout efforts to challenge the regulatory actions in issue in each case. If the regulatory actions were proper — or if Quirk is barred from seeking to establish their impropriety — then these claims necessarily fail. It follows that these claims are barred along with the appeals from the underlying regulatory actions. This ruling resolves what remains of Civil Action No. 02-00694.
Some of the cases raise questions about the scope of the covenant with respect to the project. The project is described, in the fourth recitation in the agreement, as follows:
[A] project commonly referred to as the Quarry Hills Recreation Complex on the Quincy landfill and adjoining lands and the ball fields project on MDC land in Quincy, and referred to herein as the “Quarry Hills Project,” [where] QHA proposes to construct and operate an 18 to 27 hole golf course and other recreational facilities on land located off Ricciuti Drive and owned in part by Quincy, in part by the Metropolitan District Commission (“MDC”), and, potentially, in part by the Town of Milton and in part b QHA (“the Project Site”).
The parties agree that this description does not include the Granite Rail Quarry project. Accordingly, the Court will not dismiss claims relating to that project on these motions. Three cases, Civil Actions Nos. 00-1517, 00-1997, and 01-1994, relate only to that project. One, Civil Action No. 00-1773, includes claims relating to both the Quarry Hills Project and the Granite Rail Quarry Project. Quincy, as well as the Commonwealth, has moved for summary judgment in this case. Enforcement of the.covenant requires dismissal, on Quincy’s motion, as to all defendants, of all claims in this case relating to the Quarry Hill Project.
The remaining two cases, Civil Actions Nos. 01-00808 and 01-01987, involve residential development at the project site, and the latter refers to development *527 of a hotel. The description of the project in the agreement refers only to recreational facilities, not to any residential development or hotel, suggesting that plans for non-recreational development may postdate the agreement. The parties have not addressed this question in their memoranda. Rather than rule on it without the benefit of briefing, the Court will leave this issue open at this time, subject to renewed motions.
CONCLUSION AND ORDER
For the reasons stated, the Court rules and orders as follows on the defendants’ motions for summaiy judgment:
The Motions of the Defendant, Quarry Hills Associates, Inc., for Summary Judgment, are ALLOWED in Civil Actions Nos. 98-02107, 99-00974, 99-01380, 00-00061, 00-00381, 00-00885, 01-01037, 01-01340, 01-01624, 01-01804, 01-01998, and 02-06924. JUDGMENT of dismissal shall enter forthwith in each of these cases as to all claims and all parties. As to Civil Action No. 01-00808, the motion is DENIED at this time, without prejudice to renewal upon further briefing with respect to the issue of whether the covenant extends to non-recreational development at the project site. QHA may renew its motion by serving a supplemental memorandum and any supporting materials not later than January 10, 2003; the plaintiff may respond not later than January 20, 2003; and all materials shall be filed with the Court promptly thereafter.
The Defendant Ciiy of Quincy’s Motions for Summary Judgment are ALLOWED in Civil Actions Nos. 01-01340, 01-01340, 01-01998 and 02-00694; judgment shall enter in these cases as ordered upon the motions of QHA. As to Civil Actions Nos. 01-00808 and 01-01987, the motions are DENIED at this time, without prejudice to renewal in the manner, and upon the schedule, set forth supra with respect to the motion of QHA in Civil Action No. 01-00808. As to Civil Actions 99-00445, 00-01517 and 00-01997, the motions are DENIED. As to Civil Action No. 00-1773, the motion is allowed as to those counts of the complaint that relate to the Quarry Hills Project (counts I, II, III, V, and counts VI, VIII, IX, and X insofar as these counts relate to the Quarry Hills Project), and otherwise DENIED. No action is necessary on Quincy’s motion in Civil Action No. 01-01804, as Quincy is not a parly to that case.
The Motion of the Commonwealth of Massachusetts for summary judgment requires no action with respect to Civil Action Nos. 98-02107, 99-00974, 99-01380, 00-00061, 00-00381, 00-00885, 00-10773, 01-01037, 01-01340, 01-01624, 01-01804, 01-01998, and 02-06924, in light of the orders herein on the motions of QHA and Quincy. As to Civil Action Nos. 00-01517, 00-01997, and 01-0994, the motion is DENIED. As to Civil Action No. 01-00808, the motion is DENIED at this time, without prejudice to renewal in the manner, and upon the schedule, set forth supra with respect to QHA’s motion.
The Defendant Town of Milton’s Motion for Summary Judgment requires no action with respect to Civil Actions Nos. 01-01037, 01-01340, 01-01624, and 02-00694, in light of the orders herein on the motions of QHA and Quincy. As to Civil Action No. 01-00808, the motion is DENIED at this time, without prejudice to renewal in the manner, and upon the schedule, set forth supra with respect to QHA’s motion.
The Defendant McCourt Construction Company, Inc.’s Motion for Summary Judgment requires no action with respect to Civil Actions Nos. 00-01773, 01-01804, 01-01340, 01-01998, and 02-00694, in light of the orders herein on the motions of QHA and Quincy. As to Civil Action No. 01-00808, the motion is DENIED at this time, without prejudice to renewal in the manner, and upon the schedule, set forth supra with respect to QHA’s motion.
The Defendants Sverdrup Civil, Inc.’s and Jacobs Civil, Inc.’s Motions for Summary Judgment require no action with respect to Civil Actions Nos. 01-01340, 01-01624, 01-01804, and 02-00694, in light of the orders herein on the motions of QHA and Quincy. As to Civil Action No. 01-00808, the motion is DENIED at this time, without prejudice to renewal in the manner, and upon the schedule, set forth supra with respect to QHA’s motion.
The Defendant New England Waste Services of ME, Inc., d/b/a New England Organic’s Motion for Summary Judgment in Civil Actions Nos. 01-01340 and 02-00694 requires no action in light of the orders entered herein on motions of QHA and Quincy.

The eighteen cases include one, no. 01-01987, that was not referenced in the scheduling order but that is the subject of a motion for summary judgment based on the covenant not to sue filed by Quincy.

The Court has relied on the statements submitted by the moving parties pursuant to Superior Court Rule 9A(b)(5), supporting documentation, and responses thereto submitted by the plaintiff, deeming admitted those factual assertions set forth in the statements, supported by evidence offered or by Court records, that have not been contested in the manner provided by that rule, with reference to admissible evidence offered. Deemed admitted, in this manner, are those statements to which the plaintiff has responded merely “denied,” without any record reference. Where the statements refer to the contents of documents, the Court has disregarded characterizations and paraphrases, referring to the documents themselves. With respect to additional facts asserted by the plaintiff in its responses, pursuant to Superior Court Rule 9A(b)(5), the Court has taken as true, for purposes of these motions, those factual assertions that are supported by evidentiary materials offered and referenced. The Court has disregarded characterizations and conclusions asserted in all parties’ Rule 9A(b) (5) statements.

There are actually a number of plaintiffs. It appears to be undisputed, at least for purposes of these motions, that all of them are related to and/or controlled by Quirk. For simplicity, this memorandum will refer to the plaintiffs collectively in the singular, as Quirk.

The Commonwealth did not become a party to the settlement agreement, despite the Attorney General’s involvement in its negotiation. At argument, counsel provided somewhat varying versions of the reasons for that circumstance. The reasons are not material to these motions.

Apparently Quirk conducts an “auto auction” on Mondays.

In this provision Quirk undertakes to provide the stipulation executed not only by himself, but also by “the Additional Named Individuals,” and also to cause those persons to cooperate with respect to certain possible court-ordered further proceedings. The “Additional Named Individuals” are not parties to the agreement.

The fourth of these mutual covenants acknowledges that the agreement does not waive obligations to comply with law; the fifth reserves rights each party “may have relative to claims on matters not covered by the terms of this Agreement."

In his memorandum in opposition to these motions, Quirk asserts that this payment was “(i]n recognition of the damages Quirk had already incurred.” He offers no evidence in support of that assertion.

The documents offered are submitted without sufficient identification or authentication to meet evidentiary requirements. Nevertheless, the Court has considered those that appear on their face likely to be admitted in evidence at trial, if offered with appropriate foundation or certification, either as party admissions or as business or public records. The Court has disregarded those documents that, on their face, appear inadmissible, including those that contain unsworn statements of persons who, as far as the Court can determine from the face of the documents, are neither opposing parties or their agents, nor public officials recording observations made in the scope of their duties. Minutes of the “Subcommittee on Dust Problems” of the “Quarry Hills Advisory Committee," and correspondence from members of that organization, fall into this category; the Court has disregarded them.

Quirk’s memorandum describes Webster & Sampson as “Quincy’s own engineering firm.” The evidentiary materials offered neither confirm nor refute this description. For present purposes, the Court assumes it to be true and accordingly treats these reports as party admissions.

The only identification of Bhatti appearing in the evidentiary materials offered is his letterhead, showing him as president of The Bhatti Group, Inc., “Enviroment. Transportation . Construction Management & Mitigation.” Quirk’s memorandum describes him as having been “hired by Quincy to review the Project’s dust mitigation efforts and head a ‘Dust Mitigation Committee.’ ” As with Webster & Sampson, the Court assumes this to be true and accordingly treats the statements in his reports as party admissions.

Mr. Standley’s letterhead describes him as a “Consultant in Environmental Management.” Although the evidentiary materials offered do not otherwise explain his role, Quirk’s memorandum describes him as “Quincy’s environmental consultant.” Here again, the Court assumes this to be true and treats his statements as party admissions.

The Court disregards Quirk’s assertion as to this person’s motivation, since Quirk would not be competent to testify on that subject.

The Court disregards assertions in Quirk’s memorandum on this point, since they are unsupported by any evidence offered.

The Court disregards as hearsay Quirk’s recitation of statements made to him by employees and customers as to their observations on this subject.

Quirk’s response to this assertion in Sverdrup’s Rule 9(A)(b)(5) statement is “Denied,” without reference to any supporting material. Such a response constitutes an admission under the rule.

The complaint does not identify the nature of the specific performance sought. In answer to an interrogatory on this subject, Quirk stated that he is “entitled to specific performance of all remaining obligations of Quarry Hills and the City of Quincy under the agreement." In his memorandum and at argument Quirk has suggested that the claim for specific performance was directed particularly at the provisions of paragraph 7 of the agreement, regarding acknowledgment of liability for potential contamination.

Quirk offers no evidence on this subject in connection with the present motions.

Quincy has moved for summary judgment in this case, as in all cases in which it is a party, but makes no argument that the covenant applies to any of the claims made in this case.

The parties also agree that this case is moot, since the filling has already been completed, but they disagree as to the appropriate form of dismissal; motions addressing that issue await hearing.

QHA refers in its memorandum to this case, along with nos. 00-1517, 01-1994, and 01-1997, as relating to the Granite Rail Quarry Project. It does, but not exclusively. McCourt initially moved for summary judgment in this case, but has since withdrawn its motion, adopting QHA’s position.

As to this case, like No. 00-1517, the parties also agree 'that the case is moot, since the filling has already been completed, but they disagree as to the appropriate form of dismissal; motions addressing that issue await hearing.

New England Waste Services Management of ME, Inc., describes its role as providing “coordination of the transfer of Short Paper Fiber products” and “compost for use in landscaping work, ” under a contract with QHA dated May 9, 2000. Quirk does not dispute this description.

Quincy has also moved for summary judgment in this case, indicating that it is uncertain whether it is a parly.

For this reason, the Court does not consider the assertions in Quirk’s affidavit as to how he weighed the various aspects of the agreement at the time of its execution, nor does the Court consider corresponding assertions in some of the defendants’ papers as to their purposes in entering into the agreement.

At argument, counsel informed the Court that the process of transporting material excavated from the Central Artery Tunnel Project was completed at the end of 2001, although construction continues, necessarily involving transportation of some amount of other material.

The very existence of this mechanism within paragraph 4, in addition to the overall dispute resolution mechanism provided in paragraph 9, suggests the parties’ recognition from the outset that dust control measures were unlikely to be completely successful, that dust would necessarily cause Quirk some harm, and that damages would adequately compensate for that harm.

If inadequate traffic control caused other detriment to Quirk, the record does not so indicate.

Indeed, considered in context, it appears likely that 10(d) was intended primarily to protect Quincy — the only party to the agreement that has a law enforcement function— from a subsequent contention that it had waived Quirk’s obligation to comply with applicable law with respect to the anticipated “modification, expansion, or improvement” of its business referred to in paragraph 10(c).